

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**03/15/2010**

| | | |
|---|---|---|
| IN RE: | § | |
| **JOSHUA CRAIG CHAPPELL,** | § | **Case No. 09-31411** |
| **Debtor(s).** | § | |
| | § | **Chapter 13** |
| | § | |
| **KSPR HAMILTON, INC.,** *et al*, | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **Adversary No. 09-03180** |
| | § | |
| **JOSHUA CRAIG CHAPPELL,** *et al*, | § | |
| **Defendant(s).** | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

For the reasons set forth below, the Court grants, in part, and denies, in part, Plaintiffs' motion for summary judgment.

### Jurisdiction & Venue

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334. This proceeding is a non-core proceeding under 28 U.S.C. § 157(b).[1]  Venue is proper in this District pursuant to 28 U.S.C. § 1408.

---

[1] Defendants Jay Rudman and Joshua Chappell had bankruptcy cases pending in the Southern District of Texas when this adversary proceeding was filed on May 14, 2009. Joshua Chappell's case, Case No. 09-31411, was pending before Judge Isgur. Chappell's case was dismissed on May 27, 2009. Jay Rudman's bankruptcy case, Case No. 09-31412, was pending before Judge Paul. Rudman's case was dismissed on June 25, 2009. Rudman subsequently filed a second bankruptcy case on August 3, 2009, Case No. 09-35578, which is currently pending before Judge Paul.

On December 17, 2009, the Court ordered the Plaintiffs to Show Cause (Doc. No. 23) why the case should not be dismissed due to the dismissal of Chappell's bankruptcy case and the dismissal and re-filing of Rudman's bankruptcy case. *See In Querner*, 7 F.3d 1199, 1201 (5th Cir. 1993) (providing that "the dismissal or closing of a bankruptcy case should result in the dismissal of related proceedings"; however, the "decision to retain jurisdiction over related proceedings rests within the sound discretion of the bankruptcy court"). The Plaintiffs responded to the Show Cause Order on January 7, 2010 (Doc. No. 25) by explaining why economy, fairness, convenience and comity favored retention of jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353, 108 S. Ct. 614, 620-21, 98 L. Ed. 2d 729 (1988). The Court found merit in Plaintiffs' response and issued an Order Retaining Jurisdiction on January 13, 2010 (Doc. No. 27).

## Background

This lawsuit concerns causes of action brought by KSPR Hamilton, Inc. ("KSPR"), Robert J. Kruckenmeyer, Peter Schmar and Perry Podaras  (collectively, "Plaintiffs") against Jay Rudman and Joshua Chappell (collectively, "Defendants") for breach of fiduciary duty, breach of contract, conspiracy and fraud.  Plaintiffs seek actual damages, exemplary damages, a determination that the damages are non-dischargeable, and attorneys' fees.

The Plaintiffs filed a motion for summary judgment on August 31, 2009.  The Defendants did not file a response to the motion for summary judgment.  The Court will evaluate the motion for summary judgment based on the summary judgment record.

The lawsuit arises out of the business that Defendants conducted for their own benefit while employed in a fiduciary capacity by KSPR from December 20, 2007 through April 15, 2008.  For the sake of clarity, the Court will discuss the facts of each month separately.

### i.   December 2007

KSPR was formed on December 20, 2007 as a duty drawback, tariff recovery and trade consulting business ("trade consulting business").  Rudman was the catalyst behind KSPR's formation.  Rudman approached Podaras in the fall of 2007 and proposed starting a trade consulting business.  Podaras then sought out Kruckemeyer and Schmar as potential investors. Podaras, Kruckemeyer, and Schmar subsequently met with Rudman on more than one occasion. At these meetings, Rudman represented that he:

(i) Had over 20 years experience in the trade consulting business;

(ii) Would be able to begin obtaining clients and producing revenue for the new company immediately;

(iii) Was close to closing a deal with the Republic of Angola that would generate approximately $1,300,000.00 in commissions; and

(iv) Was not barred by a non-compete agreement with his previous company, IDS, from engaging in the proposed trade consulting business.

These meetings—and Rudman's representations, in particular—led to the formation of KSPR.  Kruckemeyer, Schmar and Podaras ("Directors") were the initial Directors of KSPR. Each director contributed $16,666.00 and received 20% of KSPR's shares.  Rudman was elected KSPR's president on December 20, 2007.  Rudman received 40% of KSPR's shares and an annual salary of $100,000.00.

### ii.  January 2008

On January 2, 2008, Rudman hired Chappell as vice president of KSPR.  Chappell received 10% of Rudman's shares in KSPR and an annual salary of $60,000.00.

KSPR also moved into its office space, located at 800 Commerce Street, Houston, Texas 77002 on January 2, 2008.  At this point, Defendants were expected to perform KSPR's daily work and begin obtaining clients immediately.  The Directors were willing to assist Defendants in obtaining clients through their various contacts.

 By the end of January 2008, Defendants had not obtained any clients for KSPR and the deal with the Republic of Angola had not closed.  However, unbeknownst to the Directors, Rudman prepared a Trade Consulting Service Agreement ("TCS Agreement") between himself, personally, and the Republic of Angola during the month of January. Plaintiffs' Exhibit 11.

The first paragraph of the TCS Agreement stated, "AGREEMENT, dated this ___ day of January, 2008, by and between *JAY J. RUDMAN*, with offices at 1151, Katy, Texas 77450 (hereinafter "Consultant") and *THE REPUBLIC OF ANGOLA* (hereinafter "Company")." *Id.*

(emphasis original).  Interestingly, the TCS Agreement's first paragraph did not indicate that KSPR was a party.  The only address for notice contained in the document was a fragmented part of Rudman's personal address.

The next paragraph described Rudman's services: "WHEREAS, Consultant is engaged in the business of providing professional consulting services related to global trade services including, but not limited to, trade off, subsidies, compliance, sale and purchase tracking, and the recovery and payment of allowable avoidance of tariffs or refunds . . . ." *Id.*  The document then outlined the specific terms of the TCS Agreement and was signed by Jay Rudman at the bottom. *Id.*  Neither the body of the agreement nor the signature page made any mention of KSPR.

### iii.  February 2008

In February 2008, Schmar developed a lead on potential business for KSPR.  Schmar was introduced to Valerie S. Cahill, a member of the Board of Commissioners for the Port of New Orleans, by Boudy Degeyter.  Cahill was a valuable contact for KSPR because she had many contacts with companies who were in KSPR's target market for trade consulting services. Schmar then directed Rudman to arrange a meeting with Cahill.  Schmar asked Rudman to notify him before meeting with Cahill because Schmar was interested in attending the meeting. Rudman met with Cahill on or about February 25, 2008, without informing Schmar.

By the end of February, KSPR's business was progressing much slower than the Directors had originally anticipated.  Defendants had not obtained any clients for KSPR or provided any evidence—other than Rudman's oral assurances—of potential deals that could close in the near future.  However, as in January, Rudman solicited business for himself, personally, without the Directors' knowledge.

On February 14, 2008, Rudman sent a letter addressed to Ambassador Josefina Pitra Diakite at the Embassy of the Republic of Angola. Plaintiffs' Exhibit 12.  In the letter, Rudman expressed his "willingness to assist with the enhancement of tariff, trade and business development related to any and all commodities for entities of the Republic of Angola." *Id.*

On February 19, 2008, Rudman sent another letter to Ambassador Diakite thanking her for "arranging the meeting yesterday with Sonangol USA." Plaintiffs' Exhibit 13.  The letter also outlined the substance of Rudman's meeting with Sonangol USA: "Mr. Sumbe was kind to spend considerable time in a one on one meeting with me where I addressed my willingness to help all of the Republic of Angola with any and all commodities.  However, we mainly focused on examples of business development issues including subsidies and refund tools to increase profitability and market share for Sonangol US specifically." *Id.*  Rudman concluded the letter by stating, "Mr. Sumbe requested a detailed proposal and work plan specific to Sonangol USA, which I am happy to provide in addition to the data that is included for you that will begin to give an idea of the revenues associated with the trade efforts.  I look forward to coming to Luanda and providing business development, as well as trade, tax and tariff reductions globally." *Id.*

Both letters sent in February 2008 were signed by Jay Rudman and provided the following contact information: Jay Rudman, 1151 Flagmore Drive, Katy, Texas 77540, 713-305-4914, Jrudman0@comcast.net. "C. Chappell" is carbon copied on both letters.  Neither letter makes any mention of KSPR.

### iv.  March 2008

In March 2008, Rudman represented to the Directors that he was making progress obtaining clients for KSPR.  Specifically, Rudman represented that Cahill had introduced him to

Gail Seaman at Burlington Northern and that he expected to close a deal with Burlington Northern by March 21, 2008.  Rudman also stated that he had sent proposed contracts to 13 companies.[2]   However, in late March, when the Directors met with Defendants to discuss KSPR's progress, Defendants did not produce any documents indicating their progress.

Also in March 2008, Defendants engaged in business for themselves, personally, without the Directors' knowledge.  On March 6, 2008, Defendants executed a Non-Circumvention, Non-Disclosure and Working Agreement ("NCND Agreement"). Plaintiffs' Exhibit 14.  The NCND Agreement was signed by both Defendants and also included the name and email address of Joyce Ness.[3] *Id.*  According to the NCND Agreement, the addresses of Rudman and Chappell were 1151 Flagmore Drive, Katy, Texas 77450 and 6310 Old Glory, Katy, Texas 77449, respectively.  KSPR is not mentioned anywhere in the NCND Agreement.

The NCND Agreement stated, in part, that "[e]ach Party will not, in any manner, solicit nor accept any business from sources nor their affiliates that are made available by the other party to the Agreement at any time nor in any manner without the express written permission of the party who made the source available." *Id.*  It further provided that "[t]he Parties will not disclose any names, addresses, telephone, fax numbers or e-mail addresses of any contact revealed by any party to third parties, and that each recognize such contacts to be exclusive and valuable contact of the respective party, and that they will not enter into any direct negotiations or transactions with such contacts revealed by the other party." *Id.*

In addition to the NCND Agreement, Jay Rudman also prepared two other agreements in March 2008.  First, on March 13, 2008, Rudman, signed a Non-Circumvention, Non-Disclosure

---

[2] Rudman claimed he sent proposed contracts to Airbus, Angola et. al., Burlington Northern, Carnival Corporation PLC, CSX Transportation, Ethanol Inc., Morgan Stanley Heidmar, Nike Inc., Norwegian Cruise Lines, Servisair, Singapore Airlines, Union Pacific Railroad and Westlake.

[3] Although Joyce Ness is named on the NCND Agreement, Joyce Ness did not sign the document.

and Working Agreement with New Day Group, LLC ("NDG Agreement").[4] Plaintiffs' Exhibit 15. Rudman executed NDG Agreement on behalf of Petroleum Partners, LLC, with an address of 1151 Flagmore Drive, Katy, Texas 77449. *Id.*

Second, Rudman prepared a drawback services agreement[5] on behalf of Chapman & Hill Consulting. Plaintiffs' Exhibit 16. The agreement's caption stated: "AGREEMENT, dated this ___ day of March, 2008, by and between CHAPMAN & HILL CONSULTING, with offices at 1151 Flagmore Drive, Katy, Texas 77450 (hereinafter "Consultant") and AEP INDUSTRIES, INC., 125 Phillips Avenue, South Hackensack, NJ, 07606. (hereinafter "Company")." *Id.* According to Plaintiffs, Chapman & Hill is presumably a combination of the names of Chappell, Rudman, and Valerie Cahill; the three individuals had discussed forming a consulting company. However, Jay Rudman's name is the only name that appears on the document and the document was not signed by any person.

### v. April 2008

On March 31, 2008, the Directors wrote a memorandum to Defendants formally requesting a number of documents by 2:00 p.m. April 2, 2008. The Directors requested:

(i) Rudman's Non-Compete Agreement with his immediate former employer;

(ii) the proposed contracts between KSPR and any other entity that received a contract;

(iii) information showing the method in which each proposed contract was transmitted;

(iv) all written communications with potential clients discussing proposed contracts; and

(v) the point of contact between KSPR and each potential client.

---

[4] The document is signed by Kevin Marshall of New Day Group, LLC.

[5] The agreement's language is nearly identical to that of the TCS Agreement that Rudman presented to the Republic of Angola. See Plaintiffs' Exhibit 11. It states, in relevant part, "WHEREAS, Consultant is engaged in the business of providing professional consulting services related to global trade services including, but not limited to, trade off, compliance, sale and purchase tracking, and the recovery and payment of allowable voidance of tariffs or refunds . . . ." Plaintiffs' Exhibit 15.

Defendants did not provide any information by April 2, 2008. On April 11, 2008, the Directors sent a second request for information to Defendants, which sought the same information as the first request, by April 15, 2008 at 4:00 p.m. During the weekend of April 12 and 13, Defendants removed all of their personal belongings from KSPR's office and attempted to delete[6] all the information contained on KSPR's computers. Defendants did not comply with the Directors' request by April 15.

The Directors voted to remove Rudman and Chappell from their respective positions as President and Vice President on April 15, 2008. The Directors did not learn that Defendants— who never generated any revenue for KSPR— had conducted business on behalf of anyone other than KSPR until after April 15, 2008.

## Summary Judgment Standard

Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings.[7]

---

[6] According to the affidavit of Robert Kruckemeyer, Kruckemeyer was able to recover some of the documents that Rubman and Chappell attempted to delete. The recovered documents include most of the exhibits relied upon in this Opinion.

[7] Rule 56 was amended, effective December 1, 2007. Although most changes were stylistic, the changes to Rule 56(c) were substantive. Prior to the amendment, Rule 56(c) provided that the Court "shall" grant summary judgment if the relevant criteria were met. Effective December 1, 2007, the word "shall" was changed to "should". The Committee Notes to the 2007 amendment state that the word "[s]hould" was substituted for "shall" to recognize that, "although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56 advisory committee's notes (2007). As one commentator noted, "even when a motion for summary judgment is properly made and supported, it need not be granted . . . [s]uch a motion may be granted - indeed, it should be granted - but it does not have to be granted." Bradley S. Shannon, *Should Summary Judgment Be Granted?*, 58 Am. U. L. Rev. 85, 95 (2008).

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5 th Cir. 2008) ("A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party."); *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008). A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F. 393, 405 (5th Cir. 2003). The Court should not weigh the evidence inasmuch as a credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Sossamon*,

560 F.3d at 326; *U.S. v. 92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The non-moving party has a duty to respond with specific evidence demonstrating a disputed fact issue. *Celotex Corp. Cattrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *92,203.00 in United States Currency*, 537 F.3d at 507. When identifying specific evidence in the record, the non-movant must "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004); *Raga v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant does not bear the burden of proof, the movant must show the absence of sufficient evidence to support an essential element of the opposing party's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412; *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). Movants who do not bear the ultimate burden of proof often seek summary judgment after discovery has produced insufficient evidence to support the non-moving party's claims. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue" rather than relying on conclusory allegations. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163–64 (5th Cir. 2006); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Ultimately, the motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### Breach of Fiduciary Duty

Plaintiffs claim that Defendants breached their fiduciary duties to KSPR. In order establish a claim for breach of a fiduciary duty, Plaintiffs must demonstrate that:

(i)  A fiduciary relationship existed between plaintiffs and defendants;

(ii)  Defendants breached the fiduciary duty owed to plaintiff; and

(iii) Defendants' breach damaged plaintiffs.

*Punts v. Wilson*, 137 S.W. 3d 889, 891 (Tex. App.—Texarkana 2004, no pet.).

### i.  Fiduciary Relationship

The Court must first determine whether a fiduciary relationship existed between Plaintiffs and Defendants.  A fiduciary relationship exists between corporate officers and the corporations they serve. *In re Webber*, 350 B.R. 344, 364 (Bankr. S.D. Tex. 2006).  However, "[w]hile corporate officers owe fiduciary duties to the corporation they serve, they do not generally owe fiduciary duties to individual shareholders unless a contract or confidential relationship exists between them in addition to the corporate relationship." *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet. denied) (citations omitted).  *See also Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.—San Antonio 2004, no. pet.) (citing *Myer v. Cuevas*, 119 S.W.3d 830, 836 (Tex. App.—San Antonio 2000, pet. denied)) ("[T]he right to proceed against an officer or former officer of a corporation for breaching a fiduciary duty owed to the corporation belongs to the corporation itself.").

In this case, Rudman was the President and Chappell was the Vice President of KSPR. Rudman and Chappell therefore owed fiduciary duties to KSPR during the course of their employment.

Plaintiffs' motion for summary judgment is ambiguous as to whether Plaintiffs allege that Rudman and Chappell also owed fiduciary duties to Kruckeymeyer, Schmar and Podaras, individually.  Plaintiffs have not addressed whether the fiduciary duties owed to KSPR should

extend beyond KSPR in this case.  Accordingly, summary judgment is denied to the extent that Plaintiffs allege Kruckeymeyer, Schmar and Podaras were, individually, owed fiduciary duties.

### ii.  Breach of Fiduciary Duty

Next, the Court must determine whether Defendants breached the fiduciary duties they owed KSPR.  "Three broad duties stem from the fiduciary status of corporate officers and directors; namely, the duties of obedience, loyalty and due care."[8] *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)).

Plaintiffs allege that Defendants violated the duty of loyalty they owed to KSPR.  "The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation." *Gearhart*, 741 F.2d at 719. This duty also "require[es] an extreme measure of candor, unselfishness, and good faith on the part of . . . officer[s] . . . ." *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963).

The duty of loyalty includes the duty not to usurp corporate opportunities for personal gain. *Lifshutz v. Lifshutz*, 199 S.W.3d 9, (Tex. App.—San Antonio 2006, pet. denied) (citing *Holloway*, 368 S.W.2d at 577).  The "corporate opportunity" doctrine applies "where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity." *Dyer v. Shafer, Gilliand, Davis, McCollum & Ashley, Inc.*, 779 S.W.2d 474, 478 (Tex. App.—El Paso 1989, writ denied).  "When a corporate

---

[8] "The duty of obedience requires a director to avoid committing ultra vires acts" and the duty of due care "requires a director to be diligent and prudent in managing the corporation's affairs." *See Gearhart*, 741 F.2d at 719. Although Defendants may have violated these duties, Plaintiffs do not allege a violation of the duties of obedience and due care and, accordingly, the Court will not consider whether the Defendants violated such duties.  Thus, the only fiduciary duty at issue in this case is the duty of loyalty.

officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the corporation." *Id.*

Whether a fiduciary duty has been breached depends upon the facts of each case. *Holloway*, 368 S.W.2d at 576. In this case, the facts indicate that Defendants breached the duty of loyalty they owed to KSPR. Rudman and Chappell were hired by KSPR as President and Vice President, respectively, to conduct trade consulting services on KSPR's behalf. While employed in this capacity, Rudman and Chappell were legally bound to act with honesty, unselfishness and good faith in the interest KSPR. However, the evidence overwhelmingly establishes that Rudman behaved selfishly, dishonestly, and in bad faith from the inception to the termination of his employment with KSPR. Further, the evidence demonstrates that Chappell, although his actions were less egregious than Rudman's, nevertheless behaved in a manner that breached his duty of loyalty to KSPR.

### a. *Jay Rudman*

Rudman was hired as president of KSPR on December 20, 2007 to lead KSPR's trade consulting business. Within weeks of his hiring, in January 2008, Rudman offered his personal "professional consulting services"—which dealt with "trade off, subsidies, compliance, sale and purchase tracking, and the recovery and payment of allowable avoidance of tariffs or refunds"— to the Republic of Angola by proposing the TCS Agreement. See Plaintiffs' Exhibit 11. Rudman then continued to solicit trade consulting business from the Republic of Angola the following month, February 2008. Rudman sent two letters to Ambassador Josefina Pitra Diakite at the Republic of Angola's Embassy and met with Mr. Sumbe of Sonangol USA. *See* Plaintiffs' Exhibits 12 and 13.

The TCS Agreement and both letters sent to the Republic of Angola make no mention of KSPR or Rudman's position as KSPR president.  All three documents are signed by Jay Rudman and list his personal address[9] of 1151 Flagmore Drive, Katy, Texas 77540.

In essence, Rudman, personally, offered the same trade consulting services to the Republic of Angola that he was obligated to offer on behalf of KSPR.  Rudman had previously represented to the Directors that he could potentially generate over a million dollars in revenue for KSPR through services provided to the Republic of Angola.  It was this representation, in part, which led to the formation of KSPR in the first place.  There is no doubt, therefore, that KSPR had a legitimate expectancy in Rudman consummating the business opportunity with the Republic of Angola on behalf of KSPR.  Furthermore, the record indicates that KSPR had the financial resources to take advantage of the Republic of Angola opportunity,[10] and Defendants failed to offer any evidence to rebut such a finding.  Accordingly, Rudman violated his fiduciary duty of loyalty when he attempted to usurp KSPR's corporate opportunity with the Republic of Angola.

Rudman also executed two non-circumvention, non-disclosure and working agreements and prepared a drawback services agreement in March 2008, while employed as President of KSPR.  *See* Plaintiffs' Exhibits 14-16.  The first agreement, the NCND Agreement, was signed by Rudman and Chappell on March 6, 2008, and included a third party, Joyce Ness, who did not sign the document.  The second agreement, the NDG Agreement, was signed by Rudman on behalf of Petroleum Partners, LLC and a representative of New Day Group, LLC on March 13,

---

[9] Rudman lists this address as his homestead in his pending bankruptcy case, Case No. 09-35578.

[10] The additional support staff (i.e. the Directors) and capital at KSPR most likely made KSPR more capable of seizing the business opportunity with the Republic of Angola than Rudman acting alone.

2008.  The two non-compete agreements make no mention of KSPR and provide Rudman's homestead as his address.

The drawback services agreement was drafted on behalf of Chapman & Hill Consulting. Although it is not signed by any party, it includes Rudman's name and homestead address.  The Chapman & Hill agreement is nearly identical to the TCS Agreement that Rudman presented to the Republic of Angola and its language seeks to provide trade consulting services to AEP Industries.

The duty of loyalty includes "an extreme measure of candor, unselfishness and good faith." *Holloway*, 368 S.W.2d 577.  Therefore, Rudman had a duty to disclose that he had personal business interests in conflict with his duties to KSPR.  Rudman was not forthright and instead only informed the Directors he was making progress developing KSPR's trade consulting business.  For instance, Rudman represented that he expected to close a deal with Burlington Northern by March 21, 2008 and that he had sent proposed contracts to 13 companies.  Yet Rudman failed to produce any documentation of his services on behalf of KSPR, despite repeated requests from the Directors.

The NCND Agreement, NDG Agreement and the Chapman & Hill agreement, taken together, indicate that Rudman was secretly and actively engaged in furthering his own personal business interests while outwardly purporting to act on KSPR's behalf.  Through engaging in such behavior, Rudman breached his duty of loyalty to KSPR.

Finally, Rudman breached his duty of loyalty to KSPR when he secretly attempted to delete all the information from KSPR's computers. Rudman was formally requested to deliver information relating to the services he provided to KSPR on two occasions.  Rudman ignored the first request.   Rudman responded to the second request, which sought the information by April

15, 2008, by attempting to delete all of the information on KSPR's computers just days before he was supposed to provide the information to the Directors.  Rudman's attempt to conceal and destroy KSPR information was done in bad faith and violated Rudman's duty of loyalty to KSPR.

### b. Joshua Chappell

Chappell was hired as the vice president of KSPR by Rudman on January 2, 2008.  The summary judgment evidence is less damaging to Chappell than Rudman.  Nevertheless, the facts, taken together, indicate that Chappell breached the fiduciary duty of loyalty he owed to KSPR.

First, Rudman carbon-copied Chappell the two letters he sent to Ambassador Diakite at the Republic of Angola's embassy in February 2008.  *See* Plaintiffs' Exhibits 12 and 13.  It was Rudman, not Chappell, who drafted the letters. Plaintiffs have not offered evidence demonstrating that Chappell actually received the letters.  The carbon-copies only reflect that Chappell was an intended recipient of the letters.

On the other hand, Chappell's inclusion on the letters indicates that Rudman had some reason to inform Chappell of his *personal* correspondences with persons from the Republic of Angola.  The Court finds it suspect that the president of KSPR was comfortable including Chappell, KSPR's vice president, on communications that were clearly in breach of the president's duty of loyalty to KSPR.  As vice president, obligated to act with "extreme candor . . . and good faith," Chappell was bound to disclose Rudman's actions. *See Holloway*, 368 S.W.2d 577. The letters illustrate, therefore, that Rudman, the man who hired Chappell, trusted Chappell not to disclose Rudman's attempt to usurp KSPR's business opportunity with the Republic of Angola.  Nevertheless, the carbon-copies, standing alone, are insufficient evidence for a finding that Chappell breached his duty of loyalty to KSPR at the summary judgment level.

*See Sossamon*, 560 F.3d at 326 (A party seeking summary judgment must demonstrate an absence of a genuine issue of material fact).

However, the carbon-copies, taken with Chappell's actions in March and April of 2008, lead to the conclusion that Chappell breached his duty of loyalty.  On March 6, 2008, Chappell signed the NCND Agreement that was also signed by Rudman and intended to include Joyce Ness. See Plaintiffs' Exhibit 14.  Chappell and Rudman were the highest ranking officers at KSPR.  Both men were obligated to serve the interests of KSPR and had no legitimate reason to execute a secret non-compete agreement.  Yet Chappell executed the NCND Agreement, which made no mention of KSPR, and included Chappell's personal address of 6310 Old Glory, Katy, Texas 77449.

Chappell also failed to comply with the Directors' formal requests for information in April 2008.  Instead of providing information relating to Chappell's services, Chappell attempted to delete all of the relevant information from KSPR's computers over the weekend of April 12 and 13, 2008.

Chappell had a duty to act in good faith and serve KSPR's interests.  Instead, Chappell attempted to pursue other, personal business interests at the expense of KSPR.  Then, when asked by the Directors for proof of his work on behalf of KSPR, Chappell attempted to destroy all of the information on KSPR's computers.  Such behavior is antithetical to the "extreme measure of candor, unselfishness and good faith" that Chappell was required to provide as the vice president of KSPR. *See Holloway*, 368 S.W.2d 577.  Accordingly, the Court finds that Chappell breached his duty of loyalty to KSPR.

### iii. Damages

Finally, the Court must determine whether Defendants' breaches of their fiduciary duties of loyalty damaged Plaintiffs.  Plaintiffs allege damages stemming from KSPR's loss of (i) the $16,666.00 initial investment paid by each of the Directors, and (ii) the $1,300,000.00 commission from the Republic of Angola deal.  In total, Plaintiffs claim that each of the Directors was damaged in the amount of $276,666.00.  Plaintiffs base this amount on their theory that because KSPR is a Subchapter S Corporation, all profits from the deal with the Republic of Angola would have flowed through KSPR to the individual investors.  Plaintiffs claim that each of the Directors would have received $260,000.00 from the $1,300,000.00 deal with the Republic of Angola.  The sum of $260,000.00 and $16,666.00 is $276,666.00; hence total the damages sought by each Director.

The Court recognizes that KSPR was damaged by the behavior of Defendants.  For instance, while Defendants were breaching their duty of loyalty to KSPR, Rudman and Chappell received a total of $29,166.68 and $12,500.00 in salary payments, respectively, from KSPR.

However, at this stage in the litigation, the Court is unable to determine whether all of the damages sought by Plaintiffs are warranted.  First, the Plaintiffs' reliance on KSPR's status as a Subchapter S Corporation is misplaced.  Subchapter S enables a corporation to "choose to have its corporate income pass through the corporation without being subject to corporate income tax; instead that income is taxed as individual income to the shareholders." *Construction and Design Co. v. U.S. Citizenship and Immigration Servs.*, 563 F.3d 593, 595 (7th Cir. 2009).  Subchapter S status is a federal tax status; it does not alter the corporation's status as the true owner of its own assets and profits.  The fact that the profits are taxable to the owners does not mean that the cash that represents the profits must be distributed to the owners.  In this case, the alleged damages for

breach of the duty of loyalty belong, if recoverable, to KSPR.  KSPR's Subchapter S status does not change this result.  Second, Plaintiffs have alleged that Defendants personally benefited from an agreement with the Republic of Angola but have not offered evidence substantiating the allegation.  Given the lack of evidence, the Court is unable to measure damages at this time.

The Court finds that Defendants caused damages to KSPR.  No showing has been made that separate damages were inflicted on the shareholders.  The Court will require a hearing to determine the extent of the damages.

**Breach of Contract & Conspiracy**

Plaintiffs have also brought claims against Defendants for breach of contract and conspiracy.  The claims arise out of the same facts that give rise to Plaintiffs' claims for breach of fiduciary duty.  Since the Court has already found Defendants liable for breach of fiduciary duty, the Court need not consider the claims for breach of contract and conspiracy at this stage in the litigation.

**Fraud & Dischargeability**

Plaintiffs allege that Defendants committed acts of fraud while employed by KSPR. Plaintiffs seek a determination that the damages arising from Defendants' alleged fraudulent conduct should be non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

Whether fraud occurred is a question of fact. *Flanary v. Mills*, 150 S.W.3d 785, 792 (Tex. App.—Austin 2004, pet. denied).  "At common law, the term 'fraud' means an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage." *Id.* at 795. "When one has a duty to speak the truth, a false representation of a past or present material fact is fraudulent when another relies thereon to his detriment." *Id.*

The elements for actual fraud are: (1) a material representation was made; (2) when the speaker made it, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (3) the speaker made it with the intention that it should be acted upon by the other party; (4) the other party acted in reliance on the representation; and (5) the other party suffered injury as a result. *Lane v. Halliburton*, 529 F.3d 548, 564 (5th Cir. 2008); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex. 1977).

### i.  Jay Rudman

The Court finds that Rudman committed fraud while president of KSPR.

#### a.  *Material Misrepresentation*

A material misrepresentation is a representation that a "reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Am. Med. Int'l Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App.—Houston [14th Dist.] 1991, no writ.).

Rudman made multiple material misrepresentations throughout his term of employment with KSPR.  First, Rudman represented that he would soon close a deal with the Republic of Angola that would generate approximately $1,300,000.00.  It was this representation that led to the formation of KSPR on December 20, 2007.

Further, the Directors asked Rudman on multiple occasions about the status of the Republic of Angola contract and other potential business opportunities.  Rudman regularly responded with excuses for why no contracts had been signed but remained optimistic towards the Directors concerning KSPR's progress.  These representations enabled Rudman to keep his job and continue to receive a salary as president of KSPR.

It is clear that Rudman misrepresented KSPR's progress and Rudman's efforts on behalf of KSPR.

### b.  Knowledge of Falsity

The summary judgment evidence reflects that Rudman knew he was making material misrepresentations to the Directors of KSPR.  Rudman represented to Podaras, Kruckemeyer and Schmar that he was close to closing a significant deal with the Republic of Angola.  He also represented that if KSPR was formed, KSPR would be the beneficiary of the contract with the Republic of Angola.  These representations led to the formation of KSPR.  Nevertheless, in January 2008, just weeks after KSPR's formation, Rudman proposed a Trade Consulting Service Agreement with the Republic of Angola on his own behalf, and not on behalf of KSPR.  Rudman also sent letters in February 2008 soliciting business for his own personal benefit from the Republic of Angola.  Rudman's conduct clearly establishes that he never intended to share the Republic of Angola opportunity with KSPR. *See Matis v. Golden*, 228 S.W.3d 301 (intent is determined at the time the party made the representation but can be inferred from subsequent acts).  He represented to the Directors that they would benefit from the opportunity, but his behavior indicates that he knew those representations were false because he never intended to share the opportunity with KSPR.

Similarly, Rudman made representations to the Directors in March 2008 concerning the progress of KSPR.  Yet, at this same time that he claimed to be serving KSPR, Rudman was drafting, soliciting and signing multiple trade related agreements on his own behalf.  Based on this evidence, the Court finds that Rudman knew he was making false representations to the Directors concerning the progress of KSPR.

### c. Reliance

There is no doubt that the Rudman intended the Directors to rely on Rudman's misrepresentations and that the Directors did, in fact, rely on the misrepresentations. Rudman proposed forming a trade consulting business and used his purported ties to the Republic of Angola to convince the Directors to form KSPR. The Directors then formed KSPR with the expectation that Rudman would secure a large contract with the Republic of Angola. And the Directors continued to pay Rudman a salary until mid-April 2008 based on Rudman's claims that KSPR's business was progressing and would turn profitable in the future.

### d. Damages

The summary judgment evidence clearly establishes that KSPR was financially harmed by Rudman's conduct. However, the evidence does not establish the amount of damages to which KSPR is entitled. The Court reserves the question concerning the amount of damages for a later date.

### e. Conclusion

The Court finds that Rudman committed fraud. *See Flanary*, 150 S.W.3d at 792 ("When one has a duty to speak the truth, a false representation of a past or present material fact is fraudulent when another relies thereon to his detriment."). The Court additionally notes that Rudman's fraudulent conduct was particularly egregious due to his fiduciary duties to KSPR. As stated above, Rudman breached his fiduciary duty of loyalty to KSPR when he attempted to usurp KSPR's corporate opportunity with the Republic of Angola. The breach of a "fiduciary relationship can constitute fraud because the fiduciary relationship imputes higher duties, such as duties of good faith, candor, and full disclosure respecting matters affecting the principal's interests and a general prohibition against the fiduciary's using the relationship to benefit his

personal interest, except with the full knowledge and consent of the principal." *Id.* Rudman's actions clearly indicate that he had little to no regard for KSPR's interests. Rudman secretly pursued his own personal gain while outwardly claiming to serve KSPR. The Court finds that Rudman committed fraud while acting in a fiduciary capacity.

Nevertheless, it is inappropriate for this Court to consider the question of whether Rudman's debt arising from fraud—the amount of which will be determined at a later date—is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).[11] That determination must be made in an adversary proceeding brought under Case No. 09-35578, which is currently pending before Judge Paul.

### ii. Joshua Chappell

Based on the evidence submitted, the Court is not convinced that Chappell's conduct amounted to fraud in this case. There is certainly evidence that Chappell breached his duty of loyalty and may also have committed fraud in so doing, but the evidence is too attenuated to grant summary judgment at this time.

Plaintiffs do not allege that Chappell made any false representations. Unlike Rudman, Chappell was not involved in the initial formation of KSPR; and Plaintiffs did not offer evidence that Chappell made any representations regarding the Republic of Angola deal. Plaintiffs also stated that whenever Chappell was asked about the progress of KSPR, Chappell would only tell Plaintiffs to talk to Rudman. At this point, there is no definitive evidence that Chappell made any affirmative statements regarding KSPR's progress, let alone any false statements. Thus, Plaintiffs have not satisfied the first element of actual fraud and summary judgment is denied.

---

[11] Section 523(a)(2)(A) provides that an individual debtor may not discharge a debt, "for money, property [or] services . . . to the extent obtained by . . . false pretenses, a false representation, or *actual fraud*, other than a statement respecting the debtor's or insider's financial condition[.]"11 U.S.C. § 523(a)(2)(A) (emphasis added).

Summary judgment is denied on Plaintiffs claim that Chappell committed fraud. Accordingly, the Court need not address § 523(a)(2)(A) at this time.

### Exemplary Damages

Plaintiffs seek exemplary damages in the amount of $1,000,000.00 against both Rudman and Chappell.  The Court will consider the amount of exemplary damages, if any, to which Plaintiffs are entitled at the hearing to determine the amount of Plaintiffs' actual damages.

### Conclusion

For the reasons set forth above, the Court grants, in part, and denies, in part, Plaintiffs' motion for summary judgment.  A separate order will be issued.

SIGNED **March 11, 2010.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE